AO-106 (Rev: 06/09)-Application for Search Warrant

# UNITED STATES DISTRICT COURT

FILED

for the

DEC 4 2024

Northern District of Oklahoma

Heidi D. Campbell, Clerk
U.S. DISTRICT COURT

| In the Matter of the Search of | ) | |
|---|---|---|
| *an Apple iPhone 13 Pro Max IMEI 352396477497065* | ) | Case No. 24-MJ-750-JFJ |
| *and a Samsung Galaxy A15 5G IMEI 353283321739943* | ) | |
| | ) | **FILED UNDER SEAL** |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the ___Northern___ District of ___Oklahoma___ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| **21 U.S.C. § 846** | **Drug Conspiracy** |

The application is based on these facts:

**See Affidavit of Kyle Boeck, attached hereto**.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Kyle Boeck, FBI
*Printed name and title*

Subscribed and sworn to by phone.

Date: 12/4/24

_____
*Judge's signature*

City and state: Tulsa, Oklahoma

Jodi F. Jayne, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **In the Matter of the Search of an Apple iPhone 13 Pro Max IMEI 352396477497065 and a Samsung Galaxy A15 5G IMEI 353283321739943** | **Case No. _____**<br><br>**FILED UNDER SEAL** |

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, Kyle Boeck, being first duly sworn under oath, depose and state:

### Introduction and Agent Background

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the examination of property—an **Apple iPhone 13 Pro Max IMEI 352396477497065** and a **Samsung Galaxy A15 5G IMEI 353283321739943**—and the extraction from that property of electronically stored information described in Attachment B.

2. I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized by the Attorney General to request such a warrant. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since December 2022. My duties and responsibilities include conducting criminal investigations of individuals and entities for possible violations of Federal laws, particularly those laws found in Title 18 and Title 21 of the United States Code.

3. Through my training, education, and experience, I have become familiar with the manner in which individuals involved in public corruption and drug related crimes operate, and the efforts of those involved in such activity to avoid detection by law enforcement. I know, based upon my training and experience, as well as information relayed to me during the course of my official duties, that criminals involved in public corruption and drug related crimes, routinely use a variety of different methods and platforms to communicate relating to their criminal activity, including but not limited to wire and electronic communication facilities, including multiple cellular telephones, public telephones, the internet, including email, social media networks and applications (e.g. Facebook Messenger, Pinger, CashApp).

4. I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open-source information including information available on the Internet. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation.

5. Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of violations of Title 21, United States Code, Section 846 (Drug Conspiracy) will be located in the electronically stored

information described in Attachment B and is recorded on the devices described in Attachment A.

### Identification of the Devices to be Examined

6. The property to be searched is an **Apple iPhone 13 Pro Max IMEI 352396477497065** and a **Samsung Galaxy A15 5G IMEI 353283321739943** (the "**Devices**").

7. The applied-for warrant would authorize the forensic examination of the **Devices** for the purpose of identifying electronically stored data particularly described in Attachment B.

### Probable Cause

8. The FBI has been investigating violations of Title 21, United States Code, Section 846 (Drug Conspiracy), involving **Vincent Delmarco BERRY, Mateaka Mignon MANSKER, Jessica Janay BALDWIN, Michael Ray CRAWLEY** and other individuals participating in the trafficking of methamphetamine and fentanyl from Tulsa, Oklahoma to the Oklahoma State Penitentiary in McAlester, Oklahoma.

9. On December 4, 2024, based on a Complaint signed in the Northern District of Oklahoma, an arrest warrant was issued for **MANSKER** for engaging in a Drug Conspiracy to traffic fentanyl and methamphetamine, in violation of Title 21, United States Code, Section 846.

*Background drug trafficking investigation*

10. On April 7, 2024, McIntosh County Sheriff's Office Deputy Christian Degraffenreid pulled over a black car driven by **CRAWLEY** after observing multiple traffic infractions. The traffic stop occurred off I-40 near mile marker 267, in the Eastern District of Oklahoma. **Jessica Janay BALDWIN** was the only passenger in the vehicle. While conducting the traffic investigation and speaking with **CRAWLEY** and **BALDWIN**, Deputy Degraffenreid smelled the odor of marijuana and subsequently searched the vehicle. He found suspected drugs and drug paraphernalia, to include oxycodone blue circle pills, white crystal-like substance, white powder-like substance, five black cylinders wrapped in electrical tape, marijuana, white bar pills, a digital scale, and a methamphetamine pipe. Upon speaking with **BALDWIN**, he learned that she intended to bring the suspected drugs into the prison where she worked in McAlester, Oklahoma. She also told Deputy Degraffenreid she had methamphetamines and marijuana in the vehicle.

11. **BALDWIN** was subsequently confirmed to be a librarian with the Oklahoma State Penitentiary in McAlester, Oklahoma. The illegal narcotics, suspected drugs, paraphernalia, and **BALDWIN'S** Apple iPhone 13 cell phone were seized. The drugs were later sent to the lab for testing and were confirmed to be Fentanyl, Methamphetamine, Alprazolam, and Marijuana. **BALDWIN** was arrested and charged in McIntosh County District Court case number CF-2024-73A with various

drug trafficking offenses. She has since been terminated from her employment at the prison.

12. On April 9, 2024, I interviewed **BALDWIN** at the McIntosh County Jail, where she is still currently held, with DOC OIG Agent Kyle Jones. After advising her about her rights, **BALDWIN** agreed to speak.

13. **BALDWIN** stated she had been solicited by prison inmate **Vincent Delmarco BERRY** to bring contraband into the prison on his behalf. **BALDWIN** said **BERRY** communicated with her in person and via Facebook Messenger. **BALDWIN** further stated that **BERRY** put her in contact with a female associate outside of prison who texted her from multiple different phone numbers. **BALDWIN** described meeting with this female associate in multiple different locations, including the Walmart in McAlester as well as the Jason's Deli located at 61st and Memorial in Tulsa, within the Northern District of Oklahoma. **BALDWIN** explained when she met with the female, she received packages to bring into the prison for **BERRY**. **BALDWIN** admitted she had picked up the drugs from **BERRY'S** female associate in Tulsa just hours before she was arrested.

14. During **BALDWIN'S** interview, Agent Jones showed her a photograph of a female. **BALDWIN** stated the female wore a surgical mask at their meetings, but the female in the photo appeared to be the person with whom she met in Tulsa on **BERRY'S** behalf. Agent Jones also played a jail call between a female and **BERRY**,

and **BALDWIN** also positively identified the voice as belonging the female she met with, which was the same female in the photograph.

15. Based on information provided by DOC, the photograph depicted **Mateaka Mignon MANSKER**, one of **BERRY'S** frequent visitors from outside of prison. The jail call Agent Jones played for **BALDWIN** was also identified as a call between **MANSKER** and **BERRY**. The jail call came from Verizon Wireless phone number 918-388-7321, which is associated with **MANSKER**. Based information from Verizon Wireless received on June 12, 2024, the subscriber of 918-388-7321 is Meshanyel Mansker, **MANSKER's** relative according to open-source reporting. **MANSKER** also used 918-388-7321 as her phone number on her bank account. Based on other open-source reports, **MANSKER's** email is teakabently@gmail.com, which was used to register the same phone number. **MANSKER** further wrote "918-XXX-7321" as her phone number for prison visitor logs when visiting **BERRY**. **MANSKER** has also used T-Mobile, USA Inc. number 918-840-1302 to make prison phone calls to **BERRY**. Based on information provided by T-Mobile, USA Inc. on June 11, 2024, the subscriber of phone number 918-840-1302 is **MANSKER**. She also listed this as her phone number on her bank account. Based on open-source research, surveillance and car loan information, I determined that **MANSKER** resides at 1800 West Albany Drive, Apt 1213, Broken Arrow, Oklahoma 74012, within the Northern District of Oklahoma.

16. **BERRY** was previously incarcerated at the Oklahoma State Penitentiary in McAlester and is currently incarcerated in Lawton Correctional and Rehabilitation Facility in Lawton as of July 2024. He is serving a life sentence for first degree murder in Tulsa County District Court case number CF-2008-4532. He was previously convicted of various drug trafficking and witness tampering charges in Tulsa County District Court case numbers CF-2008-3891 and 2009-541. Based on DOC records, **BERRY** is a validated member of the Security Threat Group Neighborhood Crips in Tulsa, Oklahoma.

17. On April 9, 2024, District Attorney Investigator Kevin Branscum extracted **BALDWIN'S** Apple iPhone 13 pursuant to a State of Oklahoma search warrant and provided me with a copy of the extraction on April 16.

18. I reviewed **BALDWIN'S** cell phone extraction and found relevant text message conversations to **BALDWIN** from three separate telephone numbers associated with the Pinger messaging application: 262-944-6249, 972-688-0408, and 405-901-6076. The content of these Pinger messages was consistent with **BALDWIN'S** account of the events leading up to her arrest.

19. Pinger provided that 262-944-6249, 972-688-0408, and 405-901-6076 are used by the application TextFree. TextFree is an application developed and published by Pinger. Use of the TextFree App allows Android and iOS Wi-Fi enabled devices to be used to make free telephone calls as well as to send and receive text messages. TextFree also allows users to choose their own phone number.

7

20. Pinger provided information indicating that the telephone numbers 262-944-6249 and 405-901-6076 were associated with Pinger Account ID 1095719665, which was associated with email address teakabently@gmail.com, **MANSKER's** email. The telephone number 972-688-0408 was associated with Pinger Account ID 1650852597, which was registered to "Delmarco Berry," which are **BERRY'S** middle and last names. During a second interview of **BALDWIN** on May 13, she confirmed these were the numbers she communicated through to coordinate drug pick-ups and drop-offs for **BERRY**. She also confirmed **BERRY** goes by the nickname "V".

21. The following is a sample text message from 972-688-0408, associated with Pinger Account ID 1650852597, to **BALDWIN** pertaining to "V":

| Date/Time | Message Content |
|---|---|
| 09/30/23 at 6:47:12 AM UTC | "Hey good morning girl I just wanted to let you know I work today all day. And half tomorrow so we can meet tomorrow I gotta grab money and wrap stuff today and tomorrow okay? V said check messenger as well" |

The above example illustrates 972-688-0408 planning to "wrap stuff" and "grab money." It also confirms how **BALDWIN** stated **BERRY** communicated with her. Through my interview of **BALDWIN**, I know that when **BALDWIN** met with **MANSKER**, she was usually paid in cash and given packages to bring into the Oklahoma State Penitentiary.

22. The following is a sample of additional relevant communications between

**BALDWIN** and 405-901-6076, associated with Pinger Account ID 1095719665,

pertaining to smuggling contraband into the prison:

| Date/Time | Participants | Message Content |
|---|---|---|
| 12/06/2023 at 7:22:16 AM UTC | From: 405-901-6076 To: **BALDWIN** | "Are you gone be able to bring 1 today and the others as discussed or do I need to come down there today and pick 'em up with my money as well" |
| 12/06/2023 at 7:23:40 AM, UTC | From: 405-901-6076 To: **BALDWIN** | "The person that do em actually did attempt to make them smaller. I did measure them they are smaller than what they have been. But if you feel like you can't then I'm calling into work to come grab it all back" |
| 12/06/2023 at 7:25:54 AM UTC | From: **BALDWIN** To: 405-901-6076 | "I can't get the number one to stay in there. It's uncomfortable when I walk it won't stay so I'm just gonna take two today because I don't know what else to do. I'll have to figure out in the morning something with the other one I don't have time to do it this morning, but yeah I'm a little bitty thing I can't handle shit like that. Unfortunately unfortunately." |
| 12/06/2023 at 7:29:06 AM UTC | From: 405-901-6076 To: **BALDWIN** | "I'm about to see if he wants you to do that or if he wants me to come get it all. For future references we gone start looking at em together before you just take off cause i don't like the confusion of if it'll be able to be done or not. I can know at that time before handing things over w/ my money." |

Based on my interview of **BALDWIN**, to avoid detection when bringing the

packages into prison, she "keistered" them within her body. Based on my training

and experience, I know "keistering" is a commonly practiced concealment and

transport method to place contraband inside the body within the vagina or anus. I

know through my interview of **BALDWIN** and the McIntosh County incident report

that the packages **BALDWIN** "keistered" to bring into the prison contained

suspected drugs. Based on evidence seized from the arrest of **BALDWIN**, the

suspected drugs wrapped in black tape were numbered. Based on the above text

messages, **BALDWIN** and 405-901-6076 are referencing the numbered drug

packages.

23. The following is a sample of additional relevant communications between

**BALDWIN** the various telephone numbers associated with Pinger Account IDs

1095719665 and 1650852597 pertaining to canine detection units at the prison:

| Date/Time | Participants | Message Content |
|---|---|---|
| 07/27/2023 at 10:34:12 AM UTC | From: **BALDWIN** To: 262-944-6249 | "When I was showing up for work there were several k9 trucks and shit out front I had to turn around and take that back home wasn't worth the risk of trying it. It was pretty obvious what was gonna happen today so let him know what's going on but I'll catch back up tomorrow and I can do." |
| 11/21/2023 at 8:02:18 AM UTC | From: **BALDWIN** To: 972-688-0408 | "The canine unit is at work I kept driving. What do you want me to do? I'm not pulling him with this on me. It's too much of a risk do I do." |

Based on my training and experience, canine units are often used by law

enforcement agencies to detect the presence of drugs. **BALDWIN** did not want to

bring anything to Oklahoma State Penitentiary when canine units were present,

which shows that **BALDWIN** was attempting to bring drugs into prison without

detection.

24. The following is a sample of communications by **BALDWIN** with the various telephone numbers associated with Pinger Account IDs 1095719665 and 1650852597 pertaining to drop-off and pickup of the contraband:

| Date/Time | Participants | Message Content |
|---|---|---|
| 01/09/2024 at 10:20:42 AM UTC | From: **BALDWIN** To: 972-688-0408 | "I put it where it supposed to be today" |
| 03/11/2024 at 7:14:05 AM UTC | From: 405-901-6076 To: **BALDWIN** | "He said you can bring it to h-block today his guy waiting" |

H-block is a unit within Oklahoma State Penitentiary that houses inmates. I know through the interview of **BALDWIN** that she would usually drop the drug packages off in the H-Block hallway employee restroom. Correctional Officers unlock the restroom for inmate orderlies to clean it. They do not watch the inmates closely while they clean.

25. **MANSKER** used the TextFree application to communicate with Baldwin about the drug conspiracy. I believe she had the TextFree application on her phone, as she states in her text messages to **BALDWIN. MANSKER** also appears to go by the alias "Keisha":

| Date/Time | Participants | Message Content |
|---|---|---|
| 2023-11-20 at 14:21:53 UTC | From: 405-901-6076 To: **BALDWIN** | "This Keisha my other phone died. I have a hair appt today I can't make it to glenpool at 430 period. Either you can come way earlier before I have stuff to do I MAY be done at 530 I may not I'll be getting my hair done. You are more than welcome to be there at 530 though. You may have to sit either way cause it's gone be a drive for me to get to glenpool" |

26.  Based on Pinger text messages from 972-688-0408, an account subscribed to by "Delmarco Berry" and Facebook Messenger messages to **BALDWIN** from account "Lucianno Lewis," an account partially identified by **BALDWIN** in her interview and acquired in a search warrant of **BALDWIN's** cell phone, I observed that **BERRY** has utilized a contraband cell phone while incarcerated in prison. Based on my training and experience, contraband cell phones are frequently used by inmates for drug trafficking purposes in prison. It is likely **BERRY** currently maintains a cell phone while incarcerated. The following messages are examples of **BERRY** using a cell phone while in prison for drug trafficking:

| Date/Time | Participants | Message Content |
|---|---|---|
| 2024-02-17 at 13:47:31 UTC | From: 972-688-0408 To: 918-934-5592 | "Hell yeah this Venum nobody use my phone loc ask Iz" |
| 2024-02-17 at 14:19:17 UTC | From: 972-688-0408 To: 918-934-5592 | "Hell yeah some gas and I do 22 chaps but I got the Gugu and tree for you. Y'all still don't have no halal tray to use? If so I could get Gugu and tree in it" |
| 2024-04-06 at 2:19:23 PM(UTC+0) | From: "Lucianno Lewis" Facebook Messenger To: **BALDWIN** | "I'll have everything wrapped today" |

Based on my training and experience, "Gugu" is a slang term for methamphetamine and "tree" is a slang term for marijuana. Halal food trays are a means to smuggle drugs to specific inmates. According to DOC OIG, **BERRY** also goes by the alias "Venom."

27. Due to **MANSKER's** attempts to obfuscate and hide communications with **BALDWIN** via the TextFree application, there is probable cause to believe that she

had alternative electronic methods for hiding her communications with different

people using other applications through her Verizon Wireless and T-Mobile, USA

Inc. phone numbers in furtherance of the drug conspiracy. Based on my training and

experience, having separate phones with service from different communication

providers is also a means of obfuscating communications that are likely in

furtherance of the drug conspiracy.

28. Based on communications between **MANSKER** and **BALDWIN** to

coordinate drug pick-up meetings, there is also probable cause to believe **MANSKER**

had her phone with her at the meetings:

| Date/Time | Participants | Message Content |
|---|---|---|
| 2024-01-20 at 14:32:57 UTC | From: 405-901-6076 To: **BALDWIN** | "We won't be able to meet up at the same place I'll since I'll be at work but it won't be far from where we do. I'll send you the address" |
| 2024-03-25 at 23:59:05 UTC | From: 405-901-6076 To: **BALDWIN** | "Are you here" |

29. In Pinger text messages from 972-688-0408 on March 28, 2024, **BERRY**

sends a picture of what appears to be marijuana to an unknown person and then

proceeds to give the Chime account $BerryM, an account owned by **MANSKER**, for

payment. In Pinger text messages from 972-688-0408 on December 19, 2023,

**BERRY** communicated with an unknown person regarding "tree," "gugu," and

"brown," which from my training and experience, I know to be marijuana,

methamphetamine, and tobacco, respectively. He then proceeded to give the Chime

account, $MainLine, for payment. Chime accounts $BerryM and $MainLine

continued to have transactions with each other after **BALDWIN's** arrest to include

$1,030 on June 2, 2024, and $225 on each June 13, June 19, June 27, and July 14,

2024.

30. **BERRY** and **BALDWIN** are incarcerated. **MANSKER** remains free, residing

in Broken Arrow. According to open-source reports, **BERRY** and **MANSKER** were

married on September 24, 2024. **MANSKER** and **BERRY** had recent prison phone

calls in September 2024. **MANSKER** visited **BERRY** in prison recently in September

and October 2024. **BERRY** was transferred to the Lawton Correctional and

Rehabilitation Facility in Lawton, Oklahoma in July 2024, following the Oklahoma

DOC investigation of his drug trafficking activity with **BALDWIN.**

*Mansker's Two Electronic Devices*

31. Pursuant to a federal warrant issued on November 15, 2022, the FBI began

tracking **MANSKER'S** cell phones assigned to phone numbers 918-388-7321 and

918-840-1302. The FBI identified the devices assigned to those phone numbers as an

**Apple iPhone 13 Pro Max IMEI 352396477497065** and a **Samsung Galaxy A15 5G**

**IMEI 353283321739943**, respectively.

32. FBI surveillance has confirmed **MANSKER'S** physical presence at her home

and her known place of business, which is located in Tulsa. Tracking information

associated with the **Devices** indicates that **MANSKER** almost always has both

**Devices** near her when she is at both locations. Tracking information shows that

neither of the **Devices** are typically separated.

33. As set forth above, **MANSKER** has used both phone numbers to call **BERRY** in prison. Records from Verizon and T-Mobile also show that she has had both phone numbers at times relevant to the drug conspiracy, and that they are currently assigned to the **Devices**. Block, Inc. provided that the accounts receiving illicit funds were accessed by an iPhone and other devices. City National Bank, one of the banks where the Block, Inc. funds were sent, provided that **MANSKER'S** account was accessed by an iPhone. Accordingly, there is probable cause to believe that both **Devices** were used to contact and coordinate with **BERRY**, **BALDWIN**, and other co-conspirators using Facebook Messenger, Pinger, other social media or messaging applications, and money transfer applications such as CashApp and Chime. Furthermore, there is probable cause to believe evidence of such activities in furtherance of their drug trafficking activities will be stored in those phones. Data from those phones could also identify unknown co-conspirators in the drug conspiracy.

## Technical Terms

34. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication

15

with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

16

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at

17

least four satellites, a computer connected to that antenna can
mathematically calculate the antenna's latitude, longitude, and
sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic
device used for storing data (such as names, addresses, appointments or
notes) and utilizing computer programs. Some PDAs also function as
wireless communication devices and are used to access the Internet and
send and receive e-mail. PDAs usually include a memory card or other
removable storage media for storing data and a keyboard and/or touch
screen for entering data. Removable storage media include various
types of flash memory cards or miniature hard drives. This removable
storage media can store any digital data. Most PDAs run computer
software, giving them many of the same capabilities as personal
computers. For example, PDA users can work with word-processing
documents, spreadsheets, and presentations. PDAs may also include
global positioning system ("GPS") technology for determining the
location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a
unique numeric address used by computers on the Internet. An IP
address is a series of four numbers, each in the range 0-255, separated
by periods (e.g., 121.56.97.178). Every computer attached to the
Internet computer must be assigned an IP address so that Internet traffic

18

sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

35. Based on my training, experience, and research, I know that the **Apple iPhone 13 Pro Max IMEI 352396477497065** and the **Samsung Galaxy A15 5G IMEI 353283321739943** have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**Electronic Storage and Forensic Analysis**

36. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have

19

been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

37. I know that cellular telephones are often equipped with digital cameras and those phones possess the capability to transmit and/or store electronic images. I know that in many cases, cellular telephones maintain photographs of illegal activities to include evidence of illegal drug trafficking. These photos are sometimes stored in their cellular phones and often are transmitted or sent from one electronic media device to another. I also know that cellular phones may also contain notes regarding potential illegal acts that are recorded by the subject who possesses the electronics. Furthermore, I know that text messages, emails are often used by two or more persons to communicate information regarding illegal activities, between principals and co-conspirators of those crimes.

38. I know that cellular telephones are utilized by the majority of individuals in the United States and have become a staple of communication between individuals using text messaging, visual and audible communications (telephone calls and FaceTime type communications) as well as applications like "Whatsapp", "Pinger" and "Facebook Messenger." Additionally, individuals utilize their cellular devices to take pictures, keep notes, as a GPS (global positioning System) device, and even to conduct illicit or illegal activity. Communications on phones are kept for long periods and transferred from one phone to another when replaced. This is done through the use of Cloud storage and direct transfer conducted at the time of purchase or by the individual themselves. Individuals utilize this method as not to

20

lose data that is stored on the phone such as contacts, photos, notes, and other important information to the individual. This data includes contacts used to conduct illegal activities to include drug trafficking.

39. Based on my education, training, and experience, I know that individuals involved in the use, sales, manufacturing, and transportation of illegal narcotics often use cell phones and other electronic devices to further their trade by conducting business on them via text messages and phone calls. I also know from my training, education, and experience that:

a. Drug distributors/traffickers commonly maintain books, records, receipts, notes, ledgers, and other documents/papers both electronically and in paper form, which relate to the transportation, ordering, sale, and distribution of controlled substances, even though such documents may be in code and/or identify customers/sources/co-conspirators through monikers/nicknames. Documentation such as this oftentimes results because drug distributors/traffickers commonly "front" drugs (provide controlled substances on consignment) to their clients and must account for these transactions in order to collect outstanding drug debts.

b. Drug distributors/traffickers commonly maintain addresses or telephone numbers in notebooks, papers, cellular phones, computers and electronic storage media which reflect names, address, and/or telephone numbers for their associates in the drug distribution/trafficking organization, even if

said items may be in code, and such traffickers send and receive items listed in this affidavit by mail and other common carriers.

c. Drug users, distributors and traffickers frequently take, or cause to be taken photographs or videotapes of themselves, their associates, their property/assets, and their product, and these individuals usually maintain these photographs or recordings/videos in the residences under their control. These photographs and videos are also often found in the individual's cellular telephone, computers and other electronic storage media.

d. Cellular telephones are often used to facilitate offenses and allow criminals to maintain communication with each other before, during and after the commission of offenses. I am aware that cellular telephones have the capacity to store a vast amount of information, including but not limited to: telephone numbers, voice messages, text messages, e-mail, photographs, videos, address books, records, phone call histories, contact and other information. This information may be contained on the cellular telephone.

e. Text messages and e-mails are often used by two or more persons to communicate information regarding illegal activities between two telephones or between one telephone and a personal computer. This information can include directions for deliveries, stash locations, prices, cell phone contact numbers, and instructions.

22

f.  Cellular telephones often contain stored phone numbers and contact information of individuals that conduct business with other co-conspirators that possess the cellular telephone.

g.  When drug users/dealers/traffickers use text messages to discuss topics such as quantities, prices, and the quality of controlled dangerous substances, as well as dates, times and locations for drug transactions, these communications are often in coded drug talk/jargon and require review by peace officers experienced in deciphering such communications.

h.  In my experience, and from other law enforcement officers' experience, in searching cellular telephones possessed by known drug users/distributors/traffickers, photos and/or videos have been discovered which evidence the use and distribution of controlled dangerous substances and the proceeds intended for or derived therefrom. This evidence often depicts pictures/videos of drugs for showing drug quality, condition or quantity. Moreover, users will commonly document episodes of drug use in social settings. Additionally, drug distributors will take pictures ("trophy" pictures) or otherwise capture digital recordings for the purpose of memorializing their credibility/capability as a drug dealer and accomplishments (acquisition of assets/large amounts of U.S. currency) relating thereto.

i.  In all phases of drug distribution, the utilization of cellular telephones is essential. Drug users/dealers/traffickers use cellular telephones to place

23

calls, as well as communicate by SMS text messaging. As drug dealing necessarily entails constant communications with accomplices, co-conspirators, clients, and sources, these communications virtually always take place by voice calls and text messaging over cellular telephones.

j.  Cellular telephones are almost always used by drug distributors as a way to communicate. They will communicate by verbal conversations, digital text messaging, and/or sending photographs to one another. To avoid detection, drug distributors will oftentimes speak in coded language or through use of vague messages. Sometimes the cellular telephone numbers they use are listed in a different individual's name or they will frequently change phone numbers. Drug distributors will often "drop" or switch cellular phones to avoid detection by law enforcement. This will result in the accumulation of several different cellular phones.

40. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted

24

portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

41. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the

25

device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

42. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

43. *Methods of examination.* In conducting this examination, law enforcement personnel may use various methods to locate evidence and instrumentalities of the crime(s) under investigation, including but not limited to undertaking a cursory inspection of all information within the Device. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with stored cellular device data, such as pictures and videos, do not store as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications associated with a cellular device, as it is impossible to know in advance all of the

26

unique words or phrases investigative subjects will use in their communications. Consequently, often many communications in cellular device data that are relevant to an investigation do not contain any searched keywords.

## Conclusion

44. Based on the information above, I submit that there is probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

45. I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

Kyle Boeck
Special Agent
FBI

Subscribed and sworn to by phone on December 4th, 2024.

JODI F. JAYNE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to be Searched

The property to be searched is an **Apple iPhone 13 Pro Max IMEI 352396477497065** and a **Samsung Galaxy A15 5G IMEI 353283321739943** (the "**Devices**"). This warrant authorizes the forensic examination of the **Devices** for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

### **Particular Things to be Seized**

All records on the **Devices** described in Attachment A that relate to the unlawful drug possession and distribution in violation of Title 21, United States Code, Section 846 (Drug Conspiracy), including:

1. Records relating to communication with others as to the criminal offense(s) listed above; including incoming and outgoing voice messages; text messages; emails; multimedia messages; applications that serve to allow parties to communicate; all call logs; secondary phone number accounts, including those derived from Skype, Line 2, Google Voice, and other applications that can assign roaming phone numbers; and other Internet-based communication media;

2. Records relating to documentation or memorialization of the criminal offense(s) listed above, including voice memos, photographs, videos, and other audio and video media, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos, including device information, geotagging information, and information about the creation date of the audio and video media;

3. Records relating to the planning and execution of the criminal offense(s) above, including Internet activity, firewall logs, caches, browser history, and cookies, "bookmarked" or "favorite" web pages, search terms that the user

entered into any Internet search engine, records of user-typed web addresses, account information, settings, and saved usage information;

4. Application data relating to the criminal offense(s) above;

5. Lists of customers and related identifying information;

6. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

7. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

8. All bank records, checks, credit card bills, account information, and other financial records;

9. Evidence of user attribution showing who used or owned the **Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history; and

10. All records and information related to the coordination, agreement, collaboration, and concerted effort of and with others to violate the criminal statutes listed above.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been

3

created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, instrumentalities, and/or fruits described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

4